

SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BENJAMIN R. BARRON (SBN 257094)
Assistant United States Attorney, OCDETF Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-3542
     Facsimile:  (213) 894-0142
     E-mail:     Ben.Barron@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A WARRANT AUTHORIZING THE INSTALLATION AND MONITORING OF A TRACKING DEVICE IN OR ON 2006 ACURA BTM, BEARING CALIFORNIA LICENSE PLATE 7POL137 WITH VIN JH4KB165X6C002453 | No. MJ 17-2730<br><br>APPLICATION FOR WARRANT;<br>AFFIDAVIT OF DEA DI Monika C. Shelton<br><br>[UNDER SEAL] |

   Pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, the United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, hereby requests and applies for a warrant authorizing the installation and monitoring of a tracking device on the above-captioned vehicle.  This application is based on the attached

///

///

///

1

supporting affidavit of Drug Enforcement Administration Diversion Investigator Monika C. Shelton.

DATED: November 1, 2017         Respectfully submitted,

Sandra R. Brown
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

/s/ Benjamin R. Barron
BENJAMIN R. BARRON
Assistant United States Attorney

Attorneys for Applicant
United States of America

**AFFIDAVIT IN SUPPORT OF WARRANT FOR A TRACKING DEVICE**

**I.  INTRODUCTION**

I, DI Monika C. Shelton, being do hereby declare and affirm:

**A.  BACKGROUND AND TRAINING**

1. I have been a Diversion Investigator ("DI") of the Drug Enforcement Administration ("DEA") since September 2004. I am currently assigned to the Los Angeles Field Division Diversion Group, in which capacity I prevent, detect, and investigate the diversion of controlled pharmaceuticals and listed chemicals from legitimate sources.

2. In my capacity as a DEA DI, I have received specialized training on the subjects of controlled substance diversion and money laundering, including three months of training at the United States Department of Justice Training Center in diversion investigations, including the manner in which controlled substances are diverted, marketed and consumed. As a DEA DI, I have become familiar with the manner in which controlled substances are distributed within the illicit market, the methods of payment for such controlled substances, and the efforts involved in such activity to avoid detection by law enforcement based on investigations involving the unlawful distribution of pharmaceuticals, possession with intent to distribute, and conspiracies associated with narcotics offenses. I have been involved in numerous diversion investigations regarding the unlawful importation, possession, and distribution of controlled substances and related money laundering activities.

3. I have employed a variety of investigative techniques and resources in connection with the aforementioned investigations, including physical and electronic surveillance, the analysis of

1

telephone records, and the use of informants and cooperating sources.  I have also participated and assisted in undercover operations and search warrants, and planned and executed administrative inspection warrants.

   4.   Based on my investigative training and experience, I am familiar with pharmaceutical controlled substance diversion methods, including methods of distribution, storage, and transportation of controlled substances, diverters' methods of communicating with their customers and/or co-conspirators, their methods of collecting proceeds of diversion, and their methods of laundering money to conceal the nature of their proceeds.

   5.   I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

   a.   Oral and written reports about this investigation which I have received from federal agents and investigators, and local law enforcement agencies;

   b.   Physical surveillance conducted by federal agents, investigators and task force officers, or local law enforcement agencies, the details of which have been reported to me either directly or indirectly;

   c.   A review of telephone toll records and subscriber information;

   d.   Public records;

   e.   Records of the California Department of Motor Vehicles ("DMV"), California Law Enforcement Telecommunication System, and National Crime Information Center; and

   f. Records of the California Department of Justice's Controlled Substance Utilization Review & Evaluations System ("CURES") database, which tracks all Schedule II, III, and IV controlled substance prescriptions filled or re-filled in the State of California.

  6. Unless otherwise noted, when I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations, but rather has been provided directly or indirectly by other DEA Special Agents ("SA"), DIs or law enforcement officers who conducted such surveillance.

  7. This affidavit is being submitted for the limited purpose of demonstrating probable cause for the installation, use, and maintenance of an electronic tracking device on the SUBJECT VEHICLE. I have not set forth each and every fact learned during the course of this investigation. Facts not set forth or incorporated herein are not being relied upon in reaching my conclusion that an order should be issued.

  **B.** **PURPOSE OF AFFIDAVIT**

  8. This affidavit is in support of an application for a warrant authorizing the installation and, for a period of 45 days, the monitoring of a tracking device in or on the following affected premises (hereinafter referred to as the "**SUBJECT VEHICLE**"):

      a.    A beige colored 2006 Acura, bearing California license plate number 7POL137 registered to M R NASIR at 11987 Shoshone Avenue, Granada Hills, California.

      b.    The items to be seized are the location coordinates from the tracking device while installed in or on the **SUBJECT VEHICLE**.

9.    I submit, based on the facts set forth below, there is probable cause to believe that the installation and monitoring of the tracking device in or on the **SUBJECT VEHICLE** will lead to evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 846, 842 and 841(a)(1), as well as to the identification of individuals who are engaged in the commission of those and related crimes.

## II.    PROBABLE CAUSE

### C.    BACKGROUND OF INVESTIGATION

10.    I am currently investigating Dr. Muhammad Rafiq Nasir ("NASIR") for offenses including the unlawful diversion of controlled drugs including opiates via the issuance invalid and illegitimate prescriptions, and related conspiracy. Based on records that I have reviewed, among other evidence, I know that NASIR's medical practice locations include DEA-registered locations (the North Lake Rehabilitation and Medina Center Inc., 2052 North Lake Avenue, Altadena, California; New Image Weight Loss Clinic, 14316 Telegraph Road, Whittier, California; and New Image Weight Loss Clinic 2, 1000 East Wardlow Road, Long Beach, California), as well as two unregistered locations (Pasadena Primary Care, 1403 Fair Oaks Avenue, Pasadena, California, and Whittier Family Medical Center, 12826 Philadelphia Street, Suite A, Whittier, CA).

11. Based on several duty calls that have been received by the Los Angeles Field Division Diversion Group, and in speaking with other law enforcement agents familiar with the investigation, I am aware of the following:

a. On March 9, 2015, DEA Los Angeles Diversion Group received an unsolicited tip from a source of information ("SOURCE 1") advising that she/he had information regarding the diversion of controlled substances by NASIR. SOURCE 1, a licensed therapist, reported that she/he had a patient who at one time was a patient of NASIR's, and this patient informed SOURCE 1 that NASIR was operating a "cash for prescription" business that allows "patients" to obtain controlled substance prescriptions with no medical examination. The patient is a recovering drug addict.

b. On November 3, 2015, DEA Los Angeles Diversion Group received another unsolicited tip from another source of information ("SOURCE 2"). SOURCE 2 reported that she/he had information that individuals are obtaining controlled substances, specifically Norco, Ativan, and Xanax, from NASIR.[1] SOURCE 2 (neighbor of said individuals) indicated these customers are selling the medications obtained from NASIR.

c. On February 3, 2016, DEA Los Angeles Diversion Group received another unsolicited tip from a source of information

---

[1] Norco is a brand name for hydrocodone, a Schedule II narcotic/opiate. Xanax is a brand name for alprazolam, and Ativan is a brand name for lorazepam, each of which is a Schedule IV sedative/benzodiazepine. I know from my training and experience that benzodiazepines like Xanax and Ativan are commonly sought-after by drug dealers and addicts in combination with narcotics like Norco, yet the cocktail when taken together is dangerous and magnifies the overall risk of addiction and overdose. Accordingly, I know that prescriptions of cocktails of a narcotic with a benzodiazepine is a major red flag of illicit diversion.

("SOURCE 3"). SOURCE 3 reported that she/he has a family member who is a patient of NASIR's and is a recovering drug addict. SOURCE 3 indicated she/he believes that NASIR prescribes controlled substances without legitimate medical need. SOURCE 3 further stated NASIR will call in a prescription for controlled substances to the pharmacy for said family member without a physical meeting or examination of the patient.

    d.    On April 13, 2017, agents from the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG") told the DEA LAFD Diversion Group that the HHS-OIG agents had interviewed a source of information ("SOURCE 4"), who said that NASIR has a "relationship" with the owner of a pharmacy in the Altadena area of Los Angeles to fill NASIR's prescriptions. (Note: this pharmacy is also under investigation by the LAFD Diversion Group as part of the underlying investigation.)

13.    I reviewed CURES data for prescriptions issued by NASIR for the date range September 26, 2016 to September 26, 2017. As noted above, CURES tracks all Schedule II through IV prescription controlled drugs dispensed in California. In reviewing the CURES data for this time period, I have learned the following:

    a.    NASIR's patients filled approximately 12,863 prescriptions for Schedule II through IV controlled substances during the 12-month period, which averages to 1,072 prescriptions per month.

    b.    The most common controlled substances prescribed by NASIR were Schedule II narcotics, such as oxycodone and hydrocodone, and Schedule IV controlled substances such as the benzodiazepines

6

alprazolam, diazepam (Valium), lorazepam, and clonazepam (Klonopin), along with the Schedule IV sedative zolpidem (Ambien).

  c. Typically, the prescriptions written by NASIR during the time period were combinations of an opioid such as hydrocodone or oxycodone, together with a depressant such as alprazolam, diazepam, lorazepam, or clonazepam. As noted above, I recognize from my training and experience that the combination of these drugs, particularly recurring combinations, is a major red flag of diversion. At times, these combinations were also prescribed with another Schedule IV muscle relaxant, such as carisoprodol (Soma); this cocktail (a narcotic, benzodiazepine, and carisoprodol) is known on the black market as the "holy trinity," and is a cocktail that is also particularly dangerous and a major indicator of illicit diversion. These combinations appear on CURES reports for all three of NASIR's DEA-registered practice locations.

  d. Notably, the CURES data shows that NASIR's prescriptions for those drugs are frequently at maximum strength, such as 30-mg oxycodone (the maximum strength of the immediate-acting form, which is the most sought-after on the black market), 10-mg hydrocodone, 2-mg alprazolam, and 350-mg carisoprodol. I know from my training and experience that this pattern indicates a lack of individualized care (e.g., treating patients with varying conditions, requiring varying types and strengths of drugs), thus reflecting prescribing for profit to supply addicts and traffickers.

  e. It should also be noted that on May 7, 2013, NASIR contacted the DEA to request a change of one of his DEA registration numbers, BN1228825, to FN3837739, which was granted. (During an interview conducted of NASIR in October 2017, he stated that he made

7

this switch because prescriptions were being issued under DEA registration number BN128825 without his knowledge or authorization.)  However, a query of the CURES database indicated prescriptions are still being written/filled under DEA Registration BN1228825, even though the DEA registration number was no longer valid during time period of review.  Approximately 1,576 prescriptions have been filled in the last year, in addition to the 12,863 prescriptions filled under DEA Registration FN3837739.[2]

14. Investigators have conducted surveillance of NASIR on multiple occasions during the investigation, including occasions in September and October 2017.  The agents have observed that NASIR generally does not maintain regular office hours at his DEA-registered locations or non-registered practice locations.  Based on the surveillances, I believe that NASIR will see patients between the hours of 1:00 pm and 7:30 pm, Monday through Friday.  I recognize these to be unusual hours, particularly given the volume of prescriptions reflected in CURES data for NASIR.

15. Based on the investigation, I believe that individuals operating the weight loss clinics noted above in Whittier and Long Beach (New Image Weight Loss and New Image Weight Loss 2) are dispensing controlled drugs to patients, primarily the Schedule IV drug phentermine, and that these drugs are being acquired from wholesalers using NASIR's DEA registration numbers for those

---

[2] Even assuming that NASIR was honest in his explanation for the change, I recognize that the CURES data for NASIR's new DEA registration number (FN3837739) show the same types of red flags of diversion cited above.  When paired with the other evidence cited, I believe that NASIR is profiting from invalid prescriptions even assuming that other unidentified persons also issued counterfeit prescriptions in NASIR's name and DEA registration number.

locations. In October 2017, I interviewed NASIR, during which he stated that he never applied for DEA registration numbers for those locations and that any application in his name was fraudulent. Based on the investigation, including the interview with NASIR and information that I received from the Medical Board of California regarding its own ongoing investigation into NASIR, I understand that he was hired to consult part-time at the locations and possibly to review patient files, but that he did not personally see patients there. During the surveillances conducted in this investigation of NASIR, agents did not observe NASIR at either of those locations, even though as noted above there are CURES entries for NASIR's DEA registration numbers for both sets of locations. The agents in this matter are also investigating the operators of those clinics for the illicit acquisition and distribution of controlled drugs, and are continuing to investigate NASIR's involvement with them. For example, during the October 2017 interview with NASIR, he stated that he received $1,500 to $3,000 per month in consultation fees from the operators of the clinic, which I submit is a substantial fee for once-a-week consultation/file review.

16. During the surveillances, including as recently as September 2017, investigators have observed NASIR driving the **SUBJECT VEHICLE**, including driving the car to various practice locations. Moreover, the **SUBJECT VEHICLE** is registered in the name M R NASIR (i.e., Mohammed Rafiq NASIR) at 11987 Shoshone Avenue, Granada Hills, CA 91344, which California DMV records show is NASIR's residence.

17. I submit there is probable cause to believe that the use of the tracking device on or in the **SUBJECT VEHICLE** will lead to

evidence, fruits, and instrumentalities of the above-listed offenses and will lead to the identification of individuals who are engaged in the commission of the crimes. For example, the use of a GPS tracker will assist investigators in gathering evidence on the hours that NASIR keeps at his various practice locations, in addition to the frequency and duration of his presence at the various locations. Moreover, by evidencing the locations to which NASIR travels, I expect that the requested GPS tracking device will enable investigators to identify whether NASIR is in fact physically meeting with patients and performing the good-faith medical exams at each medical practice/location in which patients are obtaining prescriptions (e.g., by comparing prescription records with the GPS data to confirm NASIR's presence at the various locations and how long he spent there compared with the volume of prescriptions issued). The requested tracking device will allow for investigators to account for NASIR's whereabouts without risking detection by NASIR and other subjects of investigation through direct surveillance, which, in my training and experience, can often be identified by drug traffickers through counter-surveillance techniques.

### III. INSTALLATION AND MONITORING

18. Based on my training and experience, I believe that a tracking device is an effective means of tracking a vehicle only if the persons who use that vehicle are not aware of the presence of the tracking device. In order for law enforcement officers or agents to install a tracking device without being detected by the users of the vehicle (or by third parties who might alert the users of the vehicle), it is often necessary to move the target vehicle

surreptitiously to another location so that the tracking device can be installed (or repaired, replaced, or removed) without detection, or to install (or repair, replace, or remove) the device during the night, including on private property, when the users of the vehicle (and/or third parties) are not able to see the law enforcement personnel who are installing the device. In my training and experience, it would not be prudent to install a tracking device in or on the **SUBJECT VEHICLE** during daylight hours, because there is a substantial risk that the law enforcement personnel performing the installation would be easily seen by NASIR, or passersby who might alert NASIR to the presence of law enforcement personnel. Indeed, agents have conducted surveillance of the **SUBJECT VEHICLE** and NASIR'S residence and the residence is located near the end of Shoshone Avenue in which the vast majority of the limited foot and vehicular traffic is of residents who live on that street or on Regency Way. NASIR's residence is secured with a gate that surrounds the house and vehicles parked in the driveway/garage(s). Thus, should, say, the **SUBJECT VEHICLE** be parked in front of the residence and agents try to install the device during the day, individuals walking by who may know NASIR and/or his car, may alert him to the activity.

22. Accordingly, it may be necessary to enter onto private property and/or move the **SUBJECT VEHICLE** in order to effect the installation, repair, replacement, and removal of the tracking device. Further, to ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and

removal of the tracking device during both daytime and nighttime hours.

23. I also respectfully request that the Court, pursuant to 18 U.S.C. § 3103a(b), delay notification of the execution of the warrant for a period of 30 days after the tracking period ends. The reason for this request is that, as set forth above, the investigation remains ongoing, NASIR is not aware of the investigation, and premature disclosure of the same would severely thwart the efforts of law enforcement.

## IV. CONCLUSION

24. Based upon the above facts related in this affidavit, statements, I believe there is probable cause to believe that DR. NASIR has used and will continue to use the **SUBJECT VEHICLE** and that the installation and monitoring of the tracking device in or on the **SUBJECT VEHICLE** will lead to evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 846, 842 and 841(a)(1).

_____
Monika C. Shelton
Diversion Investigator
Drug Enforcement Administration

Sworn to and subscribed before me this 2nd day of November, 2017

_____
United States Magistrate Judge

12